## FURLONG VS. GARRETT.

ADVERSE POSSESSION under written instrument. *(1) General statutory rule. (2-4) Proof that entry and occupation were adverse. (5) Claim of title under deed construed by contents of deed. (6, 7) Possession of land by vendee under executory contract, when that of vendor. (8, 9) Purchase of house as chattel to be occupied on the land; when purchaser becomes vendor's tenant of the land.*
REVERSAL OF JUDGMENT. *(10) What errors immaterial.*

1. One who claims title to land under sec. 6, ch. 138, R. S., must show affirmatively that he entered into possession thereof under claim of title *exclusive of any other right*, founding such claim upon a written instrument as being a conveyance of such land, and that he has been in the continued occupation and possession of the premises included in such instrument, or some part thereof, under such claim, for ten years.

2. Possession of land accompanied by acts which ordinarily accompany ownership, such as cultivation and improvement of the land, living in a house thereon, and taking the products for the possessor's use, without proof of other claim of title, does not raise a presumption that the entry and occupation were adverse to the real owner, until such occupation has continued twenty years.

3. Adverse possession must be distinct and continued, visibly and notoriously so, and evidence thereof must be strictly construed; mere general testimony that witness took possession and retained it for a certain number of years, may be only a statement of his opinions or legal conclusions from facts which ought to be specifically shown; and where, in addition

to such general statements, the witness merely testified that he collected rent of some of the persons who occupied houses on the land, and that at some time during the period of alleged occupancy he used a dock on the premises for shipping posts, etc.: *Held*, that this would hardly be sufficient proof of such an entry and continuous occupation as the law requires to establish a prescriptive right under the ten-year limitation, even in case the deed under which the entry (if any) was made, had purported to convey the whole title.

4. The claim of title with which entry is made, cannot be afterwards enlarged except by acts equivalent to a new entry and new claim of adverse possession. *Pepper v. O'Dowd*, 39 Wis., 538.

5. Evidence that one entered under a certain deed, claiming title, must be construed to mean that he claimed *such title as that deed purported to convey;* and where the deed was a mere quitclaim, and recited that the grantor had only a contract for the land from X, the evidence shows that the entry (if any) was not under a claim of title exclusive of any other right, but subject to the rights of X.

6. The possession of the vendee under an executory contract is not adverse to the title of the vendor until after payment of the contract price.

7. Possession of land under an executory contract of sale is the possession of the vendor; and if the vendor has acquired a legal title by his own and his vendee's adverse possession, he (and not the vendee) may maintain ejectment against a stranger; unless, after payment of the purchase money, the vendee has retained possession long enough to acquire a prescriptive title in himself as against his grantor. 13 Wis., 472; 19 id., 537.

8. One who purchases a house as a chattel, of the acknowledged owner of the land on which it stands, with an express or implied agreement that he may occupy it where it stands for an indefinite time, becomes, if he takes possession, a tenant at will of the vendor, as to the land upon which the house stands.

9. But where the vendor does not appear to have had any title to the land, or to have made any claim to such title at the time of selling the house, and nothing was said about the future occupancy of the land after the sale, and no rent was reserved, and the premises were actually occupied by such purchaser for more than ten years without any payment or claim of rent, it was not error, in ejectment for the land by the vendor of the house against the purchaser, to hold, as matter of law, that defendant did not take possession as plaintiff's tenant.

10. Errors against a plaintiff are immaterial where his own evidence, uncontradicted, would not have supported a verdict in his favor.

11. Ch. 21 of 1875 does not entitle a party to demand a special verdict, where the proofs are such that, apart from that statute, the court may properly order a nonsuit, or determine as matter of law which party is entitled to a verdict.

Furlong vs. Garrett.

APPEAL from the Circuit Court for *Door* County.

Ejectment. The defendant had a verdict, by direction of the court; and from a judgment thereon the plaintiff appealed. The case is stated in the opinion.

For the appellant, a brief was filed by *Hudd & Wigman*. and the cause was argued orally by *Mr. Hudd*. They contended, 1. That the court erred in the admission of evidence for the defendant. 2. That plaintiff's evidence tended to show title in him by adverse possession under sec. 6, ch. 138, R. S. *(Pepper v. O'Dowd*, 39 Wis., 538; *Wilson v. Henry*, 40 id., 594), and the question should have been submitted to the jury. 1 Chand., 231; 3 id., 240; 5 Wis., 429; *Lawrence University v. Smith*, 32 id., 587. The exception in Ranney's deed to plaintiff did not include any land, but the house was sold merely as a chattel. *Rich v. Zeilsdorf*, 22 Wis., 544; 24 Me., 118. 3. That the facts in evidence showed that defendant had been tenant at will or by sufferance of the plaintiff. *Cross v. Upson*, 17 Wis., 618; *Hennesy v. Farrell*, 20 id., 42. The tenant's possession must be deemed that of the landlord until the expiration of ten years from the termination of the tenancy. R. S., ch. 138, sec. 11; *Quinn v. Quinn*, 27 Wis., 168. 4. That the court erred in refusing to submit to the jury for a special verdict the questions propounded by the plaintiff. Those questions being legal and proper, the court was absolutely bound to submit them. Laws of 1875, ch. 21, sec. 1; 43 Ind., 553; *Harbaugh v. The People*, 33 Mich., 241.

For the respondent, a brief was filed by *Tracy & Bailey*, and the cause was argued orally by *Mr. Tracy*. They contended, 1. That the exception in Ranney's deed to plaintiff must include land necessary for the support of the house. The thing excepted must be a part of that from which it is excepted. The deed of a house carries with it land necessary to its use. 3 Washb. R. P., 336; *Blake v. Clark*, 6 Greenl., 436; *Rackley v. Sprague*, 17 Me., 281; *Munroe v. Stickney*, 48 id., 458; *Woodman v. Smith*, 53 id., 81; *Wooley v. Groton*, 2 Cush.,

305; *Johnson v. Raynor*, 6 Gray, 107; *Forbush v. Lombard*, 13 Met., 109; *Allen v. Scott*, 21 Pick., 25; *Dunklee v. Railroad Co.*, 4 Foster, 489. 2. That the evidence did not show plaintiff to have entered as defendant's tenant. 3. That plaintiff's evidence was entirely insufficient to establish title by adverse possession under sec. 6, ch. 138, R. S. (1) The deed from Nolan to Ranney gave the latter no color of title to any part of lot 2 except that actually occupied by the former (*Woods v. Banks*, 14 N. H., 101, 111); and color of title is necessary to sustain plaintiff's claim by adverse possession. *Powell's Lessee v. Hannan*, 2 Peters, 241; *Wright v. Mattison*, 18 How., U. S., 50; *Dickinson v. Breeden*, 30 Ill., 299; *Jackson v. Andrews*, 7 Wend., 152. (2) There is no constructive possession of the whole from possession of a part, unless the latter is an actual, visible, physical possession, coupled with a claim to the right of possession of the whole, and following an entry as upon the whole. Nothing of this kind was shown here. (3) Even if possession at times of some parts of the premises was shown, there was no sufficient affirmative proof of a *continuous* possession of any part during the period required by the statute. *Sydnor v. Palmer*, 29 Wis., 251–2. (4) The house sold by Gunderson to defendant, and the other houses on the land, were bought and sold as mere chattels; no rent was ever paid for the use of the land; the occupation by Gunderson was not in any way subordinate to any pretended rights of Ranney, as owner of the land; the latter did not claim any such rights, but he and the owners of the houses were all squatters alike, and so regarded themselves and each other. Upon the construction of the statutory provisions touching adverse possession, counsel cited *Lewis v. Disher*, 32 Wis., 504; *Wilson v. Henry*, 35 id., 241; *Stephenson v. Wilson*, 37 id., 482; *Pepper v. O'Dowd*, 39 id., 538; *Wilson v. Henry*, 40 id., 594; and *Sydnor v. Palmer, supra.*

TAYLOR, J. This action was brought to recover the posses-

sion of a parcel of land described in the complaint, being a part of lot 2, sec. 25, T. 34, R. 29 E. The defendant was in possession at the time the action was commenced. The plaintiff produced no evidence of title in himself derived from the United States or from any other acknowledged source of title, but claimed to recover upon two grounds: *First*, that he and his grantors had held the land sought to be recovered, adversely, under claim of title exclusive of any other right, founding such claim upon a deed conveying said land to his grantors, for more than ten years. *Second*, that the defendant held the possession of the land under him as his tenant, which tenancy had expired previous to the commencement of the action. Upon the trial, the circuit judge directed a verdict for the defendant.

If the evidence produced on the trial was insufficient to sustain a verdict in favor of the appellant upon either of the grounds above stated, the direction of the judge was right, and the judgment must be affirmed; otherwise, it must be reversed.

The following evidence was introduced by the appellant: *First*, a quitclaim deed, bearing date November 7, 1864, from William J. Nolan to W. P. and D. E. Ranney, purporting to convey to the grantees, amongst other tracts of land, said lot 2. In this deed it was recited, immediately after the description, that " they are the same lands and premises conveyed to me by Joseph B. Clark, by contract bearing date the eighteenth day of May, A. D. 1853." *Second*, a deed bearing date August 26, 1873, from the said W. P. and D. E. Ranney and their respective wives, to the plaintiff, conveying the same lot 2, with other tracts. This was also a quitclaim deed, with a covenant that the " grantors have not committed, suffered or done any act or thing by means whereof the premises conveyed, or any part thereof, now or at any time hereafter, shall or may be impeached, charged or incumbered, in any manner or way whatsoever." This deed contained, immediately after

the description of the land, the following exceptions: "Except that part of lot No. 2 heretofore conveyed by the parties of the first part to Peter Uscord, being about five acres; and except that part of lot No. 3, being about one acre, heretofore conveyed by Peter McBride to school district; excepting and reserving, also, to the parties of the first part, their heirs and assigns, all and all manner of buildings upon the premises hereby conveyed, except the frame building known as the Turner House, and a log building known as the Sensaba House." The evidence of the adverse possession by the Ranneys under the first deed is contained in the testimony of one of the grantees, D. E. Ranney, and is as follows: " I received that deed from Nolan. I entered into possession of the premises at the time the deed was given, and at its date. Under this deed I managed the property — all of it, including the dock; took possession of lot 2 under this deed; remained in possession until we sold to *Furlong* in 1873. I think *Furlong* has been in possession since that time. I know *Furlong* has been in possession since that time. I refer to lot 2. While I had the property, we occupied lot 2, and paid taxes on it. I had tenants in possession of lot 2 — four or five houses with tenants and their families. No one disputed my right and possession while I was there." On the cross examination, he said: " I collected rents from tenants; can't tell from whom, without referring to my books; from the Nolan House on beach, and Sensaba House on hill. Mrs. Gilgers, I think, was one tenant. I refer to lot 2. I am not sure the Nolan House is on lot 2. The Sensaba House is the only one I am sure of; four or five other houses have been on that lot, and from these four or five I have not collected rent after I sold the houses to them. Not certain that I never collected rent from those four or five. I don't remember who occupied the house now occupied by the defendant, at the date of the Nolan deed, November 7, 1864. Mr. Gunderson paid me for two houses. He took possession of these premises in 1866.

One of the two he bought and paid me for, is the house described in the complaint, the log house covered with cedar bark. I don't think I gave him a deed for the house. When Gunderson paid me for the house, I don't remember any arrangement about occupying the land. I only gave him the house — nothing said about occupying the land. It was understood he could live there when he bought the house." To the question as to ground rent, he testified that he had received no such rent. He also says: " These houses were sold to be occupied by the purchasers; no limit to the term. I intended to let them occupy the house as long as they pleased. This was the understanding between myself and the purchasers. If I sold land with the house, it was so understood, and then I gave a deed. I considered the title as good as any we could get. I did not consider there was a better title. I had not looked up the record; was not particularly informed about the title. I did not believe the quitclaim deed gave me a title in fee simple to the land. I did not understand that Nolan had a perfect title. I entered into possession under the deed from Nolan, and claimed title under it. I understood Nolan had been in possession twelve or fifteen years before his deed to me. I found all these houses on the land. *I sold or rented the houses, not the land.* They went into possession under me, and never claimed adversely, or that they had title from any other source. Nolan claimed to have a contract under which he could get a title. I rented to Gunderson first, and afterwards sold him the house now occupied by defendant, on the premises in dispute in this action. When I sold to *Furlong*, I told him we had sold the houses. I told him we should not disturb them as long as we had the property." When recalled after the defendant had put in his evidence, he says: " I used the dock on lot 2 for cedar posts and poles, and shipped them therefrom. Loici drew wood and timber to that dock by my permission. I never rented any lands on lot 2 that I know of — land without a house, I mean,— unless

part of the land sold to McBride. ·When I rented houses, nothing was said about land."

The defendant gave evidence showing that Ranney did not have possession of any part of lot 2 after he purchased of Nolan, unless he had possession by virtue of the possession of the persons who bought the houses of him on this lot. He also gave evidence that Nolan, of whom the Ranneys bought, did not claim to own the land. One of the defendant's witnesses, Henry D. Miner, who lived on the island from 1857 to 1862, and from 1867 down to the time of the trial, and was well acquainted with lot 2, swears that since Ranney bought lot 2 and dock from Nolan, he had not used it to the knowledge of the witness; that it was suffered to go out of repair; that part of it was used for a fish house; that the Sensaba House was also suffered to go out of repair; that for two years the Ranneys owned no house on lot 2, from 1870 to 1872, and during that time they did not use the lot at all; that the Ranneys never occupied any portion of lot 2 except the Sensaba House and one other, and that they sold the warehouse, dock, etc., ten years ago; that the warehouse and store were changed into a dwelling house and sold to Gunderson by the Ranneys. Jacobson, another witness for the defendant, says he had lived on the island since 1866, and on lot 2, and owns a house there; that during that time there have been on lot 2 five or six houses — seven or eight with the Sensaba House; and that the Ranneys had used nothing on said lot 2 since he had been there.

After all this and a great deal more as to nonoccupancy was given, Ranney was recalled, and did not in any way contradict this evidence, except that he swears, as above stated, that he used the dock for cedar posts and poles, and shipped them therefrom, and that Loici drew wood and timber there by his permission. This evidence was entirely consistent with the evidence of the defendant, as this occupancy might have been before 1866.

To set the statute running, and perfect a title under the provisions of sec. 6, ch. 138, R. S. 1858, the occupant must prove affirmatively that he " entered into the possession under claim of title exclusive of any other right, founding such claim upon some written instrument as being a conveyance of the premises in question, &ast; &ast; and that he has been in the continual occupation and possession of the premises included in such instrument, or of some part thereof, under such claim, for ten years."

This subject of adverse possession has been very thoroughly discussed in this court, in the following cases: *Pepper v. O'Dowd*, 39 Wis., 548; *Wilson v. Henry*, 40 id., 608; *Link v. Doerfer*, 42 id., 394. In the last case the court expressly held that possession accompanied with acts which ordinarily accompany ownership, such as cultivation, improvement of the lands, living in a house on the same, and taking the products of the same for the possessor's use, unaccompanied by any other claim of title, did not raise a presumption that the entry or occupation was adverse to the real owner, until such occupation had continued twenty years. Chief Justice RYAN, in the opinion in that case, says: " And so the section [referring to sec. 5 of ch. 138, R. S. 1858] appears to imply a presumption of fact, subject, however, to be rebutted, that after continuous occupation, under claim of title, for twenty years, the entry shall be deemed to have been adverse. But such presumption would only shift the *onus probandi*, and does not disturb the rule that the entry controls the claim of title under it." In the case of *Pepper v. O'Dowd*, the court say: " All adverse possession must be distinct and continued, notoriously and visibly so. &ast; . &ast; And it cannot be enlarged, either as to title or extent, after entry. To constitute adverse possession, entry must be made with defined claim of title and of possession, continued while the statute runs; and, after entry, such claim cannot be enlarged, unless indeed by acts equivalent to a new entry and a new claim. &ast; &ast; Entry upon part of a

lot, under claim of title to the whole, while other part is held adversely, cannot found adverse possession of the whole lot, though afterwards the adverse possession of the other part be abandoned." See upon this subject Angell on Limitations, §§ 390, 391, 392, and the cases there cited. In the case of *Wilson v. Henry*, it is held by the court, that if the grantee in a deed which purports to convey to him the absolute title in fee, enters into possession of the land described therein, under such deed, it will be presumed that he entered under claim of title exclusive of any other right, without further proof. In *Sydnor v. Palmer*, 29 Wis., 251–3, the court hold that the evidence of adverse possession is always to be strictly construed, and every presumption is to be made in favor of the true owner; that the party whose title or remedy is to be barred, may properly stand on the letter of the statute, and insist upon a strict compliance with its conditions; that the burden of establishing the kind of possession required by the statute is upon the party claiming the title by such possession; and that the evidence must be clear and positive.

Under the decisions of this court above cited, the evidence in this case comes far short of establishing a title in the plaintiff by adverse possession. It fails in every requisite. There is not a particle of evidence given on the part of the plaintiff showing that the Ranneys entered claiming title exclusive of any other right. In fact, there is very little evidence that they entered into the possession of lot 2 at all. The only evidence is that given by Ranney. He says that he collected rent of some of the persons who occupied houses on the land, and that at some time or other he used the dock for shipping posts and poles; and there is also his general statement that he took possession, and remained in possession until they sold to *Furlong*, stating no act done except as above mentioned. In the case last above cited, the court had occasion to consider the effect of such general statements as to possession and occupation as proof of entry and of continuity of occupation.

In that case, the principal witness to prove the adverse possession had stated in his evidence that, from January, 1864, the Phœnix Lead Mining and Smelting Company had been in possession for mining purposes, and Palmer for agricultural purposes; that the possession of the defendants was open, notorious and exclusive, ever since the deed from Hollister to the witness; that he and his grantees had been in possession, and claimed and supposed they had the whole title. In commenting upon this evidence, Chief Justice Dixon, who delivered the opinion of the court, says: "It is obvious they are but statements of the opinion or conclusion of the witness from his knowledge of the facts as to the character and extent of the possession, and not a statement of the facts themselves, which the nature of the inquiry or the subject under investigation demanded, and which alone could enable the court and jury properly to solve and determine the question." The evidence of possession in that case was of a far more satisfactory nature than that given for the plaintiff in this action; and yet the court say that the verdict against the sufficiency of the evidence to establish an adverse possession was clearly right.

Not only is there a want of certain evidence to show an entry upon and occupancy of the premises for more than ten years previous to the commencement of the action, but there is no evidence that an entry was made under a claim of title exclusive of any other right; on the contrary, the evidence shows that the entry, if one was made at all, was under a deed in which it is recited that the grantor does not claim to hold or convey the legal title, but simply has a claim under a contract for purchase from one Joseph W. Clark. By accepting this conveyance, the Ranneys admit title in Clark, and their possession under that deed could not be adverse to the title of Clark, unless by some open and notorious act they disclaimed entry under his title. The evidence shows simply, if it shows anything, that the Ranneys entered under that deed, claiming title. This must be construed to mean, claiming the title

purporting to be conveyed by that deed. Such entry is not like an entry under a deed which, on its face, purports to convey the legal title and the whole thereof, and which is presumptive evidence of an entry claiming title exclusive of any other right. The entry under that deed was clearly an entry subject to the right of Clark, whatever that might prove to be, and was not and could not be adverse to that right. The possession of a vendee under an executory contract is not adverse to the vendor, until after payment of the contract price. *Vrooman v. Shepherd,* 14 Barb., 454–5; *Jackson v. Camp,* 1 Cow., 605; *Jackson v. Ellis,* 13 Johns., 118; *Jackson v. Bard,* 4 id., 230; *Tompkins v. Snow,* 63 Barb., 525; *Pitts v. Wilder,* 1 N. Y., 525.

It may, however, be said, that the possession of a party claiming title under that deed would be adverse to everybody except Clark and those claiming under him; and this is undoubtedly so, as the possessor under an executory contract for purchase is in under his vendor, and his possession is the possession of his vendor, and if it be shown that the vendor had acquired a legal title by his own and his vendee's adverse possession, such title of the vendor would be sufficient to enable him to maintain an action of ejectment; but the vendee who has not the legal title, cannot maintain an action of ejectment against a stranger in possession, even though the possession of such vendee was in part the adverse possession upon which his vendor builds his title. The vendee in possession still looks to his vendor as the holder of the legal title, and does not acquire such legal title until he procures a conveyance from him, unless, after payment of the purchase price, he shall have remained in possession long enough to acquire a title in himself as against his grantor, by adverse possession. *Eels v. Day,* 4 Conn., 95; *Jackson v. Ellis,* 13 Johns., 118; *La Frombois v. Jackson,* 8 Cow., 589; *Mumford v. Whitney,* 15 Wend., 381; *Clapp v. Bromagham,* 9 Cow., 550; *Gillett v. Treganza,* 13 Wis., 472; *Eaton v. Smith,* 19 id., 537.

Independently of the nature of the conveyance under which the plaintiff's grantors entered, the evidence shows affirmatively that they did not claim title exclusive of any other right. Ranney swears that they sold the houses thereon separate from the land; he admits that he understood they had not a good title; if at any time they conveyed any part of the land, it was by quitclaim deed; when they finally sold all their interest to the plaintiff, it was by quitclaim deed; they received the only claim they purchased, by quitclaim deed; and, the record being silent as to any declaration made by them, or either of them, that they claimed title exclusive of any other right, or that they claimed to own the land absolutely, there is an entire lack of evidence to establish affirmatively the fact that the entry and occupation, such as it was, was under a claim of title exclusive of any other right.

And it is equally impossible to say that the proof was clear and positive that the occupation of the Ranneys was visible, notorious and continuous, from the date of the deed to them to the time they quitclaimed to the plaintiff.

The only evidence of an actual possession for any considerable length of time by the Ranneys, or any other persons claiming under them, is the possession of the persons to whom they sold some of the houses, if the possession of these persons can be considered (as we think it cannot) their possession. The evidence of this possession is indefinite and uncertain as to the time when it commenced, and as to its continuity.

On the whole case, we think it is clear that no title by adverse possession was shown in the plaintiff.

The other point made by the plaintiff, that the defendant was his tenant, and could not, therefore, dispute his title, remains to be considered. The only proof given by the plaintiff to show a tenancy is the fact that Gunderson, who bought the house in question of the Ranneys, paid rent for the house to them before he bought it. For more than ten years after the purchase by Gunderson, no rent was paid to any one. Ran-

ney says that when he sold the house, he did not sell any land with it, and that nothing was said about occupying the land. It is true, in another part of his evidence, he says, in a general way, that he sold or rented the houses, not the land, and that the purchasers went into them under him, and never claimed adversely, or that they had title from any other source. It will be remembered that all these houses were sold as personal property, by bill of sale, and not by deed; that they were intended for occupation by the purchasers where they were situated, and would be worthless, or nearly so, if they were to be removed; and that no time was fixed during which they could remain on the land, and no rent was reserved for its use. Both parties treated the matter as though, so far as the Ranneys were concerned, when they got their purchase-money for the houses, no further claim was to be made of the purchasers on account of the land connected with them. The purchaser was to occupy indefinitely, without further claim or molestation on their part. This evidence does not, in our opinion, tend to prove the relation of landlord and tenant between these parties. The relations of the parties would be entirely different, if the proof showed that at the time the buildings were sold by the Ranneys, they were visibly and notoriously occupying and claiming to own the lands upon which the houses were situated. A party purchasing a house, as a chattel, of one who was the acknowledged owner of the land upon which it stood, with an express or implied agreement that he might occupy it where it stood for an indefinite time, would, undoubtedly, if he took possession, become the tenant at will of the vendor as to the land upon which it stood. But the absence of any sufficient evidence that the vendor made any claim of title to the land at the time of the sale of the house, his failure to show any title thereto in this action, in which he seeks to hold him as his tenant, the fact that nothing was said about the future occupancy of the land after the sale, and that no rent was reserved, and the actual occupancy

by the purchasers without any payment or claim of rent by the vendor, for more than ten years after the sale, negatives the claim that the purchaser took possession of the land as tenant to the vendor of the house. We are satisfied that the evidence does not establish the relation of landlord and tenant between the plaintiff and the defendant, and that the judge of the circuit court was right in taking this question from the jury.

Holding, as we do, that the evidence given on the part of the plaintiff, uncontradicted, did not make a case which entitled him to a verdict in his favor, the point made as to the admission of incompetent evidence against the objection of the plaintiff, becomes immaterial.

There was no error in refusing the application made by the plaintiff for a special verdict. Chapter 21, Laws of 1875, was not intended to take away the power which has been vested in and exercised by the judges of the common-law courts from time immemorial, of directing a nonsuit when the plaintiff fails to establish a cause of action by his proofs, or of directing a verdict either for the plaintiff or defendant, when, upon the evidence offered, it becomes a question of law as to which party is entitled to a verdict. Juries are called to determine questions of fact only, at least in civil actions; and when the facts are admitted, or not controverted, the rights of the parties are then fixed by the law applicable to the state of facts admitted or uncontroverted, and there is no function for the jury to perform in the case. This statute must receive a reasonable construction. It would be absurd to say that the legislature intended that when there is no proof to establish the facts necessary to make out a cause of action, or a defense to an established or admitted cause of action, the party against whom the verdict must go upon the law of the case, may demand that the jury shall pass upon and find these facts in the form of a special verdict. We think the true meaning of the statute is, that when the case is submitted to the jury upon

the evidence, either party may demand that the jury shall find a special, instead of a general, verdict. This is undoubtedly the construction which has thus far been given to it by the learned judges of the several circuit courts, and we have no doubt it is the true construction.

*By the Court.* — The judgment of the circuit court is affirmed.

RYAN, C. J., and LYON, J., took no part.